UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

REDEMPTION A. L'OUVERTURE,                :

                        Plaintiff,         :    16 Civ. 1809 (HBP)

        -against-                          :    OPINION
                                                AND ORDER
COMMISSIONER OF SOCIAL SECURITY,           :

                        Defendant.         :

----------------------------------X


            PITMAN, United States Magistrate Judge:


I.    Introduction


            Plaintiff brings this action pursuant to section 205(g)

of the Social Security Act (the "Act"), 42 U.S.C. § 405(g),

seeking judicial review of a final decision of the Commissioner

of Social Security ("Commissioner") denying his application for

supplemental security income ("SSI").  The parties have consented

to my exercising plenary jurisdiction pursuant to 28 U.S.C. §

636(c).

            Both sides have cross-moved for judgment on the plead-

ings pursuant to Rule 12(c) of the Federal Rules of Civil Proce-

dure (Docket Item ("D.I.") 17, 19).  For the reasons set forth

below, plaintiff's motion for judgment on the pleadings is

granted to the extent that this matter is remanded for further

proceedings pursuant to sentence four of 42 U.S.C. § 405(g) and

the Commissioner's motion for judgment on the pleadings is

denied.

II.  <u>Facts</u>[1]

    A.  <u>Procedural Background</u>

        On July 18, 2012, plaintiff filed an application for

SSI alleging that he was disabled due to arthritis,[2] Asperger's

Disorder ("Asperger's"),[3] a learning disability, scoliosis,[4]

_____

        [1]I recite only those facts relevant to my review.  The
administrative record that the Commissioner filed pursuant to 42
U.S.C. § 405(g) (<u>See</u> Notice of Filing of Administrative Record,
dated May 11, 2016 (Docket Item 11) ("Tr.")) more fully sets out
plaintiff's medical history.

        [2]Arthritis refers to the inflammation of a joint.  <u>Dorland's
Illustrated Medical Dictionary</u>, ("<u>Dorland's</u>") at 150 (32nd ed.
2012)

        [3]Asperger's Disorder or Asperger's Syndrome is a "pervasive
developmental disorder resembling autistic disorder, being
characterized by severe impairment of social interactions and by
restricted interests and behaviors, but lacking the delays in
development of language, cognitive function, and self-help skills
that additionally define autistic disorder.  It may be equivalent
to a high-functioning form of autistic disorder."  <u>Dorland's</u> at
1821-22.

        [4]Scoliosis refers to an "appreciable lateral deviation in
the normally straight vertical line of the spine."  <u>Dorland's</u> at
1681.

ankle arthritis/osteoarthritis,[5] pes planus,[6] plantar fasciitis[7]

and a fractured right fibula (Tr. 91-97, 111-34). Plaintiff

alleged that he was disabled as of May 7, 2012 (Tr. 91).

Plaintiff's claim was initially denied on November 26,

2012 and the notice of the denial was sent to the address in

Brooklyn that plaintiff noted on his disability application (Tr.

49-54, 115). Plaintiff requested a hearing before an administra-

tive law judge ("ALJ"), which was granted (Tr. 55-56, 210). The

typewritten form requesting a hearing states that plaintiff's

mailing address is "321 W 125th St 2ND FL[,] New York, NY

10027,"[8] an address in Manhattan (Tr. 55-56).

SSA sent a notice dated November 27, 2013 to the 125th

Street address above scheduling a hearing for February 19, 2014;

_____

[5]Osteoarthritis refers to a "noninflammatory degenerative
joint disease seen mainly in older persons, characterized by
degeneration of the articular cartilage, hypertrophy of bone at
the margins, and changes in the synovial membrane." Dorland's at
1344. It is characterized by pain and stiffness at times.
Dorland's at 1344.

[6]Pes planus, colloquially known as flat feet, is a condition
in which "one or more of the arches of the foot have been lowered
and flattened out." Dorland's at 716, 1421.

[7]Plantar fasciitis is a common cause of heel pain.
Dorland's at 684.

[8]This address is associated with the Ali Forney Center, a
voluntary shelter for lesbian, gay, bisexual, transgender and
questioning youth and young adults ages 16-25 in need of emer-
gency and transitional housing (Tr. 389). Plaintiff lived at the
Ali Forney Center from late 2011 until January 2013 (Tr. 389).

this notice was returned as undeliverable on December 11, 2013
(Tr. 208-10). SSA tried to contact plaintiff by mail and tele-
phone between February 5, 2014 and February 18, 2014 to inform
him of his hearing date (Tr. 83-86, 104-05, 211-14). On February
13, 2014, plaintiff left a voicemail message with SSA stating
that he had not received the SSA's previous letters because they
were addressed to his prior name[9] and that his current address
was 446 West 36th Street, New York, New York 10018 (Tr. 212). An
SSA employee left plaintiff a voicemail message on February 14
providing the date, time and address at which plaintiff's hearing
would be held (Tr. 212). The employee asked plaintiff to bring
to the hearing any information he felt was needed to prove his
case such as his doctors' contact information, names of his
medications and any work information (Tr. 212). The SSA employee
left another message for plaintiff on February 18, 2014, inform-
ing him that his hearing was the next day and advising him that
if he missed the hearing, the case may be dismissed (Tr. 213).

Plaintiff appeared for a hearing before ALJ Lori Romeo
on February 19, 2014 (Tr. 24-43). Plaintiff testified that he
had not received written notice of the hearing but that he did

---

[9]On December 16, 2013, plaintiff legally changed his name
from Dakota Denzel Manuel to Redemption Athanasius L'Ouverture
(Tr. 106-09). Some of the documents in the record refer to
plaintiff by his prior name.

learn about the hearing date through a telephone call (Tr. 27).
At the hearing, ALJ Romeo informed plaintiff of his right to
representation, and plaintiff signed a form waiving his right to
seek legal counsel (Tr. 28-29, 87).  On September 26, 2014, the
ALJ issued a decision finding that plaintiff was not disabled
(Tr. 6-19).  Plaintiff appealed that ruling to the Appeals
Council (Tr. 5).  The ALJ's decision became the final decision of
the Commissioner on January 7, 2016, when the Appeals Council
denied plaintiff's request for review (Tr. 1-4).

B.  Social Background

Plaintiff was born on December 30, 1987 and was 26
years old as of the date of the hearing (Tr. 32).  Plaintiff
identifies as an African-American, bisexual, genderqueer male
(Tr. 389).  Plaintiff completed high school in Gary, Indiana
where he had an Individualized Education Program to accommodate
his Asperger's diagnosis (Tr. 389).[10]  He graduated from Butler

----

[10]An "[i]ndividualized Education Program (IEP) is a written
document that is developed, reviewed, and revised by [a student's
school personnel] describing how the student will access the
general education curriculum (if appropriate) and the special
education and related services to be provided."  Indiana Depart-
ment of Education, "Notice of Procedural Safeguards Including
Prior Notice for Medicaid Consent, Effective July 1, 2013,"
available at http://www.doe.in.gov/sites/default/files/-
specialed/notice-procedural-safeguards-new-medicaid-consent.pdf
(continued...)

University in 2010, where he studied political science and philosophy (Tr. 389).  Plaintiff attended a seminary in New York in 2010, but was expelled from the program in approximately June of 2011 (Tr. 389).  Plaintiff returned to Indiana, but left after three months because his mother did not accept his sexual orientation (Tr. 389).  Plaintiff returned to New York and was admitted to the Ali Forney Center in December 2011 (Tr. 389).  When plaintiff reached the age of twenty-five, he was no longer eligible to remain at the Ali Forney Center, and he moved to a shelter (Tr. 34, 389).

Plaintiff reported to SSA that he worked as (1) an "Assistant Mathematics Tutor" for a non-profit from June to July of 2005, (2) a garbage collector for a government agency from July to August of 2005, (3) a clerical associate for a non-profit from June 2006 to October 2007, (4) a student worker in a work study program from June 2011 to March 2012 and (5) an academic coach for a tutoring agency from March 2012 to May 2012 (Tr. 118, 151-56).  Plaintiff stated that one of the reasons he stopped working was because he failed out of his graduate school program and became homeless, and that he "was actively trying to find stable means to sustain [him]self that correlated [with his]

limitations due to my mix of physical and psychosocial disabili-
ties" (Tr. 116).

C. <u>Medical Background</u>

1. Medical Evidence Pre-dating
   <u>Plaintiff's July 18, 2012 Application</u>

a. <u>Beth Israel Medical Center</u>

From October 2010 through January 2011, plaintiff was
treated by several doctors at Beth Israel Medical Center for a
sprained left ankle and an abscess in his left buttock (Tr.
244-56, 258-61, 267-70, 373-77).

b. Callen-Lorde Clinic/
   <u>Institute for Urban Health</u>

Plaintiff had a primary care team at the Callen-Lorde
Clinic/Institute for Urban Family Health from September 2011
through December 2012, when he aged out of the Ali Forney Center
(Tr. 271-325, 400-25). Plaintiff saw Dr. Philip Baird and others
at Callen-Lorde (Tr. 271-325, 400-25).

On September 30, 2011, Dr. Baird noted that plaintiff
suffered from an "[u]nspecified psychosocial circumstance" (Tr.
280, 288, 318-19). At a November 2011 appointment, Dr. Christina
Shenko noted that plaintiff had an angry mood and congruent

affect (Tr. 308).  Dr. Shenko noted that plaintiff was obese but in no apparent distress (Tr. 308).  Plaintiff tested positive for tuberculosis and, after consulting with Dr. Baird, Dr. Shenko referred plaintiff for a chest x-ray (Tr. 308-09).

In November 2011, Dr. Baird noted that plaintiff had tendinitis in his ankles and pain at the bottom of his heels (Tr. 271).  Throughout treatment, plaintiff had bilateral ankle pain (Tr. 271, 275, 307, 416).  On June 14, 2012, Dr. Baird noted that plaintiff visited him for "medical documentation of several orthopedic problems," namely, scoliosis, pes planus and plantar fascitis (Tr. 276).  Dr. Baird also noted that plaintiff had surgery for a fracture of his right fibula in 2007, that he had plates inserted in his leg, that he had intermittent aches and that he used a cane for walking (Tr. 276).  Dr. Baird recommended that plaintiff take anti-inflammatory medication and attend physical therapy (Tr. 273).  On June 21, 2012, Dr. Baird referred plaintiff for a radiological examination of his spine (Tr. 277). On the same date, Dr. Leonid Lampert took an x-ray of plaintiff's entire spine and found that

> [t]here is moderate to severe upper thoracic
> levoscoliosis with Cobb angle measuring 28 degrees.
> Apex is at the C4/C5 disc space.  The margins of mea-
> surement are taken at the superior aspect of the T2 and
> inferior aspect of the T7[.]
>
> There is moderate to severe lower thoracic
> dextroscoliosis with Cobb angle measuring 30.7 degrees.

> Apex is at the C4/C5 disc space.  The margins of mea-
> surement are taken at the superior aspect of the T6 and
> inferior aspect of the T12.

(Tr. 262).  The impression was that plaintiff had scoliosis and

that there was no "acute articular or bony abnormality" (Tr.

262).  On June 21 and June 29, 2012, Dr. Baird diagnosed plain-

tiff with scoliosis, pes planus, ankle arthritis and plantar

fasciitis (Tr. 273, 277-78).


           2.  Medical Evidence for the Period
               After July 18, 2012 Application


               a.  Callen-Lorde Clinic/
                   Institute for Urban Health


     Dr. Baird noted that plaintiff's "problems" as of

December 5, 2012 were "unspecified psychosocial circumstance,

tuberculosis, tendinitis in the ankle and scoliosis (Tr. 409-10).

In January 2013, plaintiff learned that he could no longer

continue seeing his doctors at Callen Lorde because his insurance

plan was not accepted there (Tr. 402).


               b.  Consultative Examiner
                   Dr. Louis Tranese


     On October 8, 2012, plaintiff saw consultative examiner

Dr. Louis Tranese for an orthopedic examination (Tr. 328-31).

Dr. Tranese noted that plaintiff did not bring any medical

records with him to the examination, and, under a section enti-
tled "Labs and Other Testing," Dr. Tranese noted "X-ray
lumbosacral spine" and "X-ray distal right tibia/fibula" without
further explanation or elaboration (Tr. 328, 330).

Plaintiff reported that he had surgery in 2007 to
repair a right fibula fracture and suffered from scoliosis (Tr.
328). He complained of episodic right ankle pain, frequent
bilateral foot pain and episodic low back pain (Tr. 328).
Plaintiff's musculoskeletal pain was relieved minimally and
temporarily by position changes and by refraining from climbing
stairs, walking extended distances and standing for long periods
(Tr. 328). Plaintiff stated that he had seizures earlier in the
year (Tr. 328). Plaintiff lived in a shelter and was not taking
any medications (Tr. 328-29). Plaintiff was able to shower,
dress and groom himself independently on a daily basis and did
his laundry and shopping once per week (Tr. 329).

Dr. Tranese observed that plaintiff used a cane that
Dr. Tranese found was not medically necessary (Tr. 329). Plain-
tiff's gait and station were normal and he was able to walk on
his heels and toes but with right ankle and foot pain (Tr. 329).
Plaintiff was able to squat fully and to rise from a chair
without difficulty (Tr. 329). Dr. Tranese observed that plain-
tiff had full ranges of motion in his cervical, thoracic and

10

lumbar spine as well as in his arms (Tr. 329-30). Plaintiff had

very mild scoliosis (Tr. 330). A straight leg raising[11] test was

negative bilaterally (Tr. 330). Plaintiff had full muscle

strength in his arms, and he had no muscle atrophy (Tr. 330).

Plaintiff had pes planus deformities on his feet and a scar on

his right ankle (Tr. 329). Plaintiff had full range of motion in

his hips, knees and ankles and full muscle strength in his legs

(Tr. 330).

Dr. Tranese's assessment was that plaintiff had a

history of a "right ankle fracture/open reduction and internal

fixation," pes planus deformities, bilateral foot and low back

pain, scoliosis and a reported history of seizures (Tr. 331).

Dr. Tranese opined that plaintiff had a "mild restriction" with

respect to heavy lifting, walking extended distances, standing

for long periods and frequent stair climbing (Tr. 331). Dr.

Tranese opined that plaintiff had no other physical functional

deficits (Tr. 331).

---

[11]A straight leg-raising test is a test in which the patient
lies supine and "the symptomatic leg is lifted with the knee
fully extended; pain in the lower extremity between 30 and 90
degrees of elevation indicates lumbar radiculopathy, with the
distribution of the pain indicating the nerve root involved."
Dorland's at 1900.

c.  Dr. Ted Woods
            <u>Consultative Examiner</u>


        On November 18, 2013, plaintiff saw Dr. Ted Woods, a
consultative examiner (Tr. 397-99).  Dr. Woods did not indicate
whether he reviewed any of plaintiff's medical records (Tr. 399).

        Plaintiff told Dr. Woods that he had broken his right
foot in 2011 and that he had surgery during which "plates and
screws" were placed in his right foot (Tr. 397).  Plaintiff told
Dr. Woods that he had occasional foot pain that was greater in
his right foot than in his left foot (Tr. 397).  Plaintiff took
over-the-counter medication for pain relief (Tr. 397).  He stated
that he could walk five-to-ten blocks before he had to stop and
was able to climb one or two flights of stairs (Tr. 397).

        Plaintiff stated that he had been diagnosed with
Asperger's and that he saw a therapist once a week (Tr. 397).
Plaintiff reported that he lived in a shelter where he was not
allowed to cook, but that he kept his area clean and did laundry
and went shopping as needed (Tr. 397).  He cared for his personal
needs without limitations and enjoyed reading (Tr. 397).

        Dr. Woods examined plaintiff and noted that he did not
use any "assistive device" (Tr. 398).  Dr. Woods also noted that
plaintiff was obese but otherwise had no physical limitations
(Tr. 398-99).  Dr. Woods examined plaintiff's thoracic and lumbar

spines and concluded that plaintiff did not have scoliosis (Tr. 398).  Dr. Woods diagnosed plaintiff with foot pain and Asperger's, by history, and opined that plaintiff had no limitations in his ability to sit, stand, push, pull, climb or carry heavy objects (Tr. 399).

d.  Federal Employment and
Guidance Service (FEGS)

Plaintiff was evaluated by Federation Employment and Guidance Services ("FEGS") in September 2014 (Tr. 458-87).  The ALJ did not have the FEGS evaluation, but it was submitted to the Appeals Council (Tr. 4).  The FEGS Biopsychosocial Summary ("BPS") indicates that plaintiff had previously met with WeCARE[12] and that WeCARE had prepared a BPS on February 15, 2013 (Tr. 459).  The February 2013 BPS is not in the record.

Plaintiff reported to FEGS that he lived in a shelter, walked to the appointment and that he normally took the bus or subway independently (Tr. 460).  He had applied for work many

_____

[12]"WeCARE, the New York City Human Resources Administration's Wellness, Comprehensive Assessment, Rehabilitation and Employment program, addresses the needs of [impoverished] clients with medical and/or mental health barriers to employment by providing customized assistance and services to help them achieve their highest levels of self-sufficiency."  See http://www.fedcap.org/content/wecare (last visited Sept. 8, 2017).

times but was unable to find a job (Tr. 461, 466).  He had been laid off from his job as a tutor (Tr. 466).

Plaintiff told the FEGS social worker that he had been diagnosed with autism spectrum disorder[13] in 2005 and with depression and anxiety in 2013 (Tr. 462).  Plaintiff also reported that he had recently started hearing voices (Tr. 463, 472).  Plaintiff also told FEGS that he was receiving mental health treatment at a clinic in the Bronx where he met with a psychiatrist once a week (Tr. 467-68).  Dr. Ralph Heiss of FEGS referred plaintiff for a psychiatric examination (Tr. 480).[14]

Plaintiff also reported that he had scoliosis, chronic osteoarthritis, a fracture in his right foot and plates and screws in his right ankle (Tr. 461-62).  He complained of difficulty climbing stairs, walking, preparing meals and housekeeping due to flat feet and foot pain (Tr. 465). Plaintiff read, walked around the city and "sometimes" attended church (Tr. 465-66).  Plaintiff reported that he stopped using a cane because he had

_____

[13]Autism spectrum disorder is a type of pervasive development disorder, which refers to a group of disorders "characterized by impairment of development in multiple areas, including the acquisition of reciprocal social interaction, verbal and nonverbal communications skills, and imaginative activity and by stereotyped interests and behaviors."  Dorland's at 549, 552.

[14]A psychiatrist subsequently examined plaintiff and concluded that plaintiff should attend psychotherapy and take medication for his psychiatric conditions (Tr. 485).

lost weight and that he could now walk 10 to 15 blocks before experiencing ankle pain (Tr. 467).

Dr. Heiss conducted a physical examination of plaintiff and opined that plaintiff was limited to lifting and pulling less than 15 pounds, standing and walking less than 30 minutes continuously and up to 3 times in 7 hours and kneeling and squatting less than twice in 7 hours (Tr. 473-82). Plaintiff was not limited in his ability to sit, manipulate or reach (Tr. 481-82). He had moderate limitations with communication and cognitive understanding, and severe-to-marked limitations in relating appropriately to co-workers and accepting supervision (Tr. 482-83). Plaintiff had a severe limitation in the ability to maintain energy, sustain attendance and achieve adequate work pace and productivity (Tr. 483). Dr. Heiss recommended that plaintiff work in a low-stress environment with positive reinforcement and frequent breaks (Tr. 483).

Based on the physical and psychological examinations, Dr. Heiss concluded that plaintiff was unstable and that he needed to receive treatment for his mental and physical disabilities before he could assess plaintiff's "functional capacity" to work (Tr. 487). Dr. Heiss' justification for this conclusion was that plaintiff was "unstable for work" (Tr. 487).

e. <u>Mental Health Treatment Records</u>

i. Callen-Lorde Clinic/
<u>Institute for Urban Health</u>

On September 11, 2012, plaintiff saw Dr. Tanveer Ahmed for a psychiatric exam (Tr. 410).  Dr. Ahmed diagnosed plaintiff with Asperger's and a pervasive developmental disorder (Tr. 410).  Plaintiff had anxiety, and difficulty with being unable to find a job despite his education (Tr. 411).  Dr. Ahmed found that plaintiff had a frustrated mood and that he had some feelings of grandiosity (Tr. 411-12).  Dr. Ahmed recommended ongoing therapy and assigned a Global Assessment of Functioning ("GAF") score[15] of 50, indicating serious symptoms (Tr. 412).

Katie Moeller, a licensed master social worker ("LMSW") from the Ali Forney Center, met with plaintiff on a weekly basis

_____

[15]"The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" <u>Kohler v. Astrue</u>, 546 F.3d 260, 262 n.1 (2d Cir. 2008), <u>quoting</u> Am. Psychiatric Ass'n, <u>Diagnostic and Statistical Manual of Mental Disorders</u>, at 32 (4th ed. 2000)).  A score of 41-50 indicates serious symptoms, a score of 51-60 indicates moderate symptoms and a score of 61-70 indicates some mild symptoms or some difficulty in social or occupational functioning, but generally functioning "pretty well."  <u>See</u> <u>Global Assessment of Functioning</u>, New York State Office of Mental Health, <u>available</u> <u>at</u> https://www.omh.ny.gov/omhweb/childservice/mrt/global_assessment_functioning.pdf (last visited Sept. 8, 2017).

from April 20, 2012 to January 15, 2013, when plaintiff aged-out of treatment at the Ali Forney Center (Tr. 378-91).

On February 27, 2013, LMSW Moeller completed a "Psychosocial Assessment" of plaintiff based on her individual therapy sessions with plaintiff through January 2013 (Tr. 389-91). LMSW Moeller noted that plaintiff was diagnosed with Asperger's and that he had tendencies towards black-and-white thinking, rigidity and grandiosity (Tr. 389-90). Plaintiff was "highly verbal" and able to maintain extended eye contact during a social exchange, but had difficulty reading social cues and often spoke at length with an air of authority that could be alienating to others (Tr. 390). Plaintiff had no significant psychiatric history (Tr. 390). Throughout the course of treatment, plaintiff was highly engaged and equipped with moderate insight about his own patterns of emotion and behavior (Tr. 390). Plaintiff discussed feelings of anxiety related to his homelessness, employment and limited social support, "but did not endorse symptoms significant enough to warrant diagnosis" (Tr. 390). LMSW Moeller went on to diagnose plaintiff with Asperger's and rated plaintiff's GAF score at 50 (Tr. 390-91).

### ii.  Harlem Black Men's Initiative

On September 19, 2012, LMSW and clinical supervisor
Sean Carrington of the Black Men's Initiative in Harlem wrote a
letter regarding plaintiff's treatment (Tr. 326).  LMSW Carring-
ton confirmed that plaintiff had been receiving psychotherapy at
the Harlem United Black Men's Initiative since May of 2012 (Tr.
326).  LMSW Carrington stated that plaintiff was committed to
treatment and, that in therapy, plaintiff was exploring issues
related to his employment, income, relationships and education
(Tr. 326).

### iii.  Consultative Psychologist
###       Dr. Jonathan Belford

On October 8, 2012, plaintiff was evaluated by consul-
tative psychologist Dr. Jonathan Belford (Tr. 333-37). Plaintiff
arrived at the evaluation by bus (Tr. 333).  He reported that he
lived in a shelter, graduated from college and began seminary
school but stopped due to academic issues and "failing out" (Tr.
333).  Plaintiff reported that he suffered from night terrors for
about one year after failing out of seminary school (Tr. 334).
Plaintiff stated that he had not had any psychiatric hospitaliza-
tions and that he was seeing a social worker at the Ali Forney
Center weekly (Tr. 333).  He was not taking medications and

reported trouble sleeping, mild depression and social withdrawal due to joblessness and homelessness (Tr. 333-34).

Dr. Belford noted that plaintiff was making a conscious effort to keep his hands from trembling throughout the evaluation (Tr. 334). Plaintiff was able to care for his personal needs but needed help shaving, cleaning and cooking due to tremors (Tr. 336). He washed his own laundry, shopped, managed money and took public transportation independently (Tr. 336). Plaintiff read, spoke to his family in Indiana on the telephone and spent his days either looking for work or in a park (Tr. 336).

Dr. Belford noted that plaintiff was neatly dressed, was cooperative and related in an adequate manner (Tr. 334). Plaintiff's eye contact was largely appropriate, but at times plaintiff closed his eyes when speaking (Tr. 335). Plaintiff's speech was fluent and his language skills were adequate (Tr. 335). Plaintiff's thought processes were coherent and goal-directed with no evidence of hallucinations, delusion or paranoia (Tr. 335). Plaintiff's affect was appropriate in speech and his mood was euthymic at times, but mainly neutral (Tr. 335). Plaintiff was oriented to person, place and time (Tr. 335). Plaintiff's intellectual functioning appeared to be average and his insight and judgment seemed poor (Tr. 335-36).

Dr. Belford diagnosed plaintiff with anxiety and hand and facial tics and stated that plaintiff's prognosis was "guarded" (Tr. 336-37). Dr. Belford opined that plaintiff could not maintain attention and concentration but could maintain a regular schedule (Tr. 336). Plaintiff could follow and understand simple directions and instructions, perform simple tasks independently, learn new tasks and perform complex tasks with supervision, and make appropriate decisions (Tr. 336). He was able to relate adequately to others and appropriately deal with stress (Tr. 336). Dr. Belford concluded that plaintiff's psychiatric problems did not appear to be significant enough to interfere with plaintiff's ability to function on a daily basis (Tr. 336-37).

### iv. Consultative Psychologist Dr. Haruyo Fujiwaki

On November 18, 2013, plaintiff was evaluated by consultative psychologist Haruyo Fujiwaki (Tr. 422-25). Plaintiff reported that he had difficulty falling asleep, anxiety, low energy and that he was frustrated with his situation (Tr. 422). Plaintiff was able to care for his personal needs, do laundry, shop for groceries, manage money and take public transportation alone (Tr. 424). Plaintiff's relationship with his family was poor and he did not have any friends (Tr. 424).

Dr. Fujiwaki found that plaintiff was cooperative in responding to questions and that his manner of relating, social skills and overall presentation were adequate (Tr. 423). Plaintiff had appropriate eye contact and adequate speech and language skills (Tr. 423). His thought process was coherent and goal-directed with no evidence of hallucinations, delusions or paranoia (Tr. 423). Plaintiff's affect was somewhat irritated and mood was depressed (Tr. 423). Plaintiff's ability to pay attention and concentrate were intact, but his remote and recent memory skills were mildly impaired (Tr. 423). Plaintiff's cognitive functioning was somewhat limited and his insight and judgment were fair (Tr. 423-24).

Dr. Fujiwaki diagnosed plaintiff with depressive disorder, cannabis abuse and Asperger's by history, and, opined that plaintiff was able to follow and understand simple directions and instructions, perform simple tasks independently, and maintain attention, concentration and a regular schedule (Tr. 424). Dr. Fujiwaki opined that plaintiff was able to learn new tasks, perform certain complex tasks independently, and make appropriate decisions (Tr. 424). He found, however, that plaintiff was moderately impaired in relating adequately with others and in dealing with stress (Tr. 424).

In October 2014, senior social worker Peter J.
Avitabile from New Alternatives, Inc.[16] provided a summary of
plaintiff's mental health treatment and gave recommendations for
future treatment (Tr. 434-38).  Mr. Avitabile noted that plain-
tiff had been a client of New Alternatives for the past six
years, which provided individual and group therapy, clinical
casework and supportive housing advocacy (Tr. 435).  Mr.
Avitabile stated that he had been directly involved in plain-
tiff's mental health care for the past three months and had
observed a "marked series of spiraling downward
tendencies/trends" in plaintiff's overall behavior and a "star-
tling, diminished self-motivation and interest in his own per-
sonal life events[,] career goals and objectives that he formerly
embraced wholeheartedly" (Tr. 438).  Mr. Avitabile noted that
plaintiff "battles with a complex array of worrisome issues that
escalate and fluctuate in categorical priority that at any given

_____

[16]"Created in 2008, the mission of New Alternatives is to
increase the self-sufficiency of homeless LGBT youth and to
enable them to transition out of the shelter system and into
stable adult lives.  [They] do this by providing case management,
education services, life skills training, community-building
recreational activities, opportunities for self-expression, and
support services for HIV+ youth." See http://newalternatives-
nyc.org/ (last visited Sept. 8, 2017).

time can rupture his cogent sensibilities and flood his normative countenance and demeanor" (Tr. 436). He recommended that plaintiff continue individual talk therapy and group therapy and start using psychotropic medication (Tr. 434).

### vi. Nurse practitioner Patricia McCabe

On October 30, 2014, nurse practitioner Patricia McCabe ("NP McCabe") provided an updated psychiatric evaluation of plaintiff in collaboration with psychiatrist Karamchand Rameshwar (Tr. 446-50).[17]

NP McCabe noted that plaintiff felt depressed, frustrated and helpless due to current psychosocial stressors of housing, school and fears concerning his mental health (Tr. 446). Plaintiff reported having auditory hallucinations over the course of the past year (Tr. 446). Plaintiff had been prescribed psychotropic medication and reported that he had not experienced any side effects (Tr. 446).

NP McCabe performed a mental status evaluation and found that plaintiff was cooperative, that he had no delusions, no hallucinations and was alert and oriented (Tr. 448). His mood

---

[17]New evidence submitted by plaintiff in connection with this motion indicates that NP McCabe performed an initial evaluation of plaintiff on August 8, 2014 (see Exhibit annexed to Pl. Notice of Motion, dated Jan. 17, 2017 (D.I. 19)).

23

was angry and depressed, his insight and judgment were fair and his impulse control was good (Tr. 448).  NP McCabe observed that plaintiff was able to attend to personal activities of daily living, travel independently, manage his own funds but had difficulty with relationships and interpersonal skills and would benefit from supportive housing (Tr. 449).

NP McCabe diagnosed plaintiff with Asperger's, major depression and an unspecified psychosis and assigned plaintiff a GAF score of 45 (Tr. 449).  NP McCabe noted that plaintiff was "experiencing early decompensation and initiation of psychotic symptoms" and prescribed plaintiff psychotropic medication (Tr. 449).

On November 6, 2014, NP McCabe prepared a "Treating Physician's Wellness Plan Report" (Tr. 444-45).  NP McCabe indicated that plaintiff was being treated at weekly psychotherapy sessions for psychosis, dysthymia, major depression and Asperger's (Tr. 444).  Plaintiff was taking psychotropic medication and was experiencing a depressed mood, anxiety, feelings of helplessness and auditory hallucinations (Tr. 444).  NP McCabe opined that plaintiff was unable to work for at least the next 12 months (Tr. 445).

D. <u>Proceedings Before the ALJ</u>

   1. <u>Plaintiff's Testimony</u>

   Plaintiff appeared at the February 19, 2014 hearing before ALJ Romeo at the SSA's office in Brooklyn, New York, without a representative (Tr. 24-43). Plaintiff started to ask the ALJ why he needed a hearing, but the ALJ did not answer the plaintiff's question. Rather, the ALJ interrupted plaintiff and sought to inform plaintiff of his right to counsel (Tr. 28).[18]

   The ALJ's statement to plaintiff on his right to counsel and plaintiff's response is as follows:

   ALJ: [A] representative could help you find additional evidence or examine witnesses, or submit additional arguments. But you are not required to have a repre-

_____

[18]This colloquy appears on the transcript as follows:

   ALJ: All right. Do you want your hearing transferred to Manhattan?

   [Plaintiff]: Well I'm here now. I don't see --

   ALJ: Okay. Fair enough.

   [Plaintiff]: -- a reason why I need to have a hearing --

   ALJ: All right. No, I just wanted to make sure you were satisfied. Okay. You're here today without a representative.

   [Plaintiff]: Yes.

(Tr. 28).

sentative, and the Social Security Administrative [sic] does not provide you with a representative. Now if you had gotten the notice of hearing we would have sent you a form with that indicating that there were agencies that might represent you for free if you qualified for their services, and that there are also attorneys who might represent you for a fee, but you pay that fee only if benefits are awarded to you. Unfortunately you did not get that notice, but I'm trying to explain it to you now. With that understanding did you wish to waive your right to a representative or are you seeking representation?

[Plaintiff]: I waive my right.

(Tr. 28-29). The record does not indicate whether the ALJ actually provided plaintiff with a list of organizations that provide free or paid services to individuals seeking SSI benefits. The ALJ asked plaintiff to sign a waiver form stating that he received such a list and waiving his right to representation; plaintiff signed the form (Tr. 29; see Tr. 87 (signed Waiver of Right to Representation form dated February 19, 2014)).

The ALJ asked plaintiff if he had an opportunity to look at the medical evidence and the evidence of his earnings that had been provided to plaintiff on a compact disc and whether he believed the record was complete (Tr. 30). The plaintiff responded that the record was complete "[a]s far as [he] notice[d]" and that he could not "think of anything new that [he could] submit" (Tr. 30). The ALJ advised plaintiff that he could submit additional information after the hearing and that she

would consider it if it was received before she issued her decision (Tr. 30).

Plaintiff testified that he was born in 1987 and had completed college (Tr. 32). Plaintiff testified that he stopped working because of his "disabilities" and that he was not sure if his homelessness contributed to his inability to find work (Tr. 33). He explained that he tried to get help finding work but that he had not been able to secure employment (Tr. 33). He lived in a shelter and while he knew how to cook, he did not cook for himself (Tr. 34). He traveled by public transportation (Tr. 34). He spent his days looking for food and at the library, where he would read and take naps (Tr. 34, 42).

Plaintiff testified that he experienced foot and ankle discomfort when walking for an extended amount of time (Tr. 34-35). Plaintiff also testified that, because he was homeless he had trouble finding food and he had lost weight (Tr. 41). He noted that the weight loss did help with his foot and ankle pain (Tr. 41). Plaintiff could sit for an hour to an hour and a half before he had to get up due to stiffness in his back (Tr. 35). Plaintiff could stand for about one hour (Tr. 35-36). Plaintiff took aspirin for pain when he could afford it (Tr. 36-37). He testified that he had not seen a "health person" consistently

since he left the "youth system" and stated that he was examined by a nurse in January of 2013 (Tr. 37).

Plaintiff testified that he had been diagnosed as a "functional autistic" in high school and that when he graduated college he was diagnosed as "autistic verbal," which he under-stood to mean that he was "verbally gifted and a high functional autistic" (Tr. 38). Plaintiff stated that he did not "fully understand" what being autistic meant (Tr. 39). He also testi-fied that he had a learning disability (Tr. 38). Plaintiff stated that he was "not as social with other people" and did not "fully fit well or get along with other people" (Tr. 39). The ALJ asked plaintiff if he had anxiety and he responded by stating that, "[i]f I'm frustrated . . . Some mornings I wake up and I'm like, ugh, another day. I guess. I don't know" (Tr. 39). Plaintiff did not like being around crowds of people and was not sure if he would do well in a job where he did not interact with the public or with co-workers (Tr. 39-40).

The hearing lasted approximately 27 minutes; the transcript is 17 pages long (Tr. 26-42).

### 2. Vocational Expert Interrogatory Responses

By letter dated April 25, 2014, ALJ Romeo asked voca-tional expert ("VE") Yaakov Taitz to respond to written interrog-

atories related to plaintiff (Tr. 88-90, 215-22). The VE re-
sponded to the interrogatories on May 1, 2014 (Tr. 224-30). The
ALJ asked the expert to consider a hypothetical worker of plain-
tiff's age, education and work experience with the residual
functional capacity to perform work at the sedentary level except
for the need to alternate between sitting and standing in two-
hour intervals, a limitation to simple tasks and the inability to
work with the public or with co-workers (Tr. 227). The expert
opined that such a hypothetical individual would be able to do
the unskilled jobs of a document preparer, listed in the U.S.
Department of Labor's Dictionary of Occupational Titles ("DOT")
Code No. 249.587-018, with 64,000 jobs in the national economy,
addresser, DOT Code No. 209.587-010, with 100,000 jobs nation-
ally, surveillance system monitor, DOT Code No. 379.367-010, with
40,000 jobs nationally and ticket counter clerk, DOT Code No.
219.587-010, with 400,000 jobs nationally (Tr. 227-29).

On May 2, 2014, ALJ Romeo sent plaintiff the entire
record to date, including the VE's interrogatory responses (Tr.
231-35). The ALJ's letter advised plaintiff that he had the
right to request a supplemental hearing and/or request that she
issue a subpoena to require the attendance of witnesses or the
submission of records (Tr. 231-32). The ALJ further advised
plaintiff that if SSA did not receive a response from him within

10 days of the date he received the May 2 letter, the ALJ would assume that plaintiff did not want to submit any written statements or records, or wish to request a supplemental hearing (Tr. 232). On May 27, 2014, ALJ Romeo noted for the record that she had not received a response from plaintiff (Tr. 236).

III. <u>Analysis</u>

    A. Applicable
       <u>Legal Principles</u>

       1. <u>Standard of Review</u>

    The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard. 42 U.S.C. § 405(g); <u>Selian v. Astrue</u>, 708 F.3d 409, 417 (2d Cir. 2013) (<u>per curiam</u>); <u>Talavera v. Astrue</u>, 697 F.3d 145, 151 (2d Cir. 2012); <u>Burgess v. Astrue</u>, 537 F.3d 117, 127 (2d Cir. 2008). Moreover, the court cannot "affirm an administrative action on grounds different from those considered by the agency." <u>Lesterhuis v. Colvin</u>, 805 F.3d 83, 87 (2d Cir. 2015), <u>quoting</u> <u>Burgess v. Astrue</u>, <u>supra</u>, 537 F.3d at 128.

    The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported

by substantial evidence.  Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir. 2003), citing Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999).  "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision," Ellington v. Astrue, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (Marrero, D.J.).  However, "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

"'Substantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Talavera v. Astrue, supra, 697 F.3d at 151, quoting Richardson v. Perales, 402 U.S. 389, 401 (1971).  Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam), quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982). Thus, "[i]n determining whether the agency's findings were supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be

drawn.'" Selian v. Astrue, supra, 708 F.3d at 417 (citation omitted).

> 2. Determination
>    of Disability

A claimant is entitled to SSI if the claimant can establish an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months."[19] 42 U.S.C. § 1382c(a)(3)(A); see also Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both the impairment and the inability to work must last twelve months).

The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. § 1382c(a)(3)(D) and it must be "of such severity" that the claimant cannot perform [his] previous work and "cannot, considering [his] age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B). Whether such

---

[19]The standards that must be met to receive SSI benefits under Title XVI of the Act are the same as the standards that must be met in order to receive disability insurance benefits under Title II of the Act. Barnhart v. Thomas, 540 U.S. 20, 24 (2003). Accordingly, cases addressing the former are equally applicable to cases involving the latter.

work is actually available in the area in which the claimant resides is immaterial.  42 U.S.C. § 1382c(a)(3)(B).

In making the disability determination, the Commissioner must consider:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999), quoting Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (internal quotation marks omitted).

In determining whether an individual is disabled, the Commissioner must follow the five-step process required by the regulations.  20 C.F.R. § 416.920(a)(4)(i)(v); see Selian v. Astrue, supra, 708 F.3d at 417-18; Talavera v. Astrue, supra, 697 F.3d at 151.  The first step is a determination of whether the claimant is engaged in substantial gainful activity.  20 C.F.R. § 416.920(a)(4)(i).  If he is not, the second step requires determining whether the claimant has a "severe medically determinable physical or mental impairment."  20 C.F.R. § 416.920(a)(4)(ii).  If he does, the inquiry at the third step is whether any of these impairments meet one of the listings in Appendix 1 of the regulations.  20 C.F.R. § 416.920(a)(4)(iii).  To be found disabled based on a listing, the claimant's medically determinable impair-

ment must satisfy all of the criteria of the relevant listing. 20 C.F.R. § 404.1525(c)(3); <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990); <u>Otts v. Comm'r of Soc. Sec.</u>, 249 F. App'x 887, 888 (2d Cir. 2007). If the claimant meets a listing, the claimant is disabled. 20 C.F.R. § 416.920(a)(4)(iii).

If the claimant does not meet any of the listings in Appendix 1, step four requires an assessment of the claimant's residual functional capacity ("RFC") and whether the claimant can still perform his past relevant work given his RFC. 20 C.F.R. § 416.920(a)(4)(iv); <u>see</u> <u>Barnhart v. Thomas</u>, <u>supra</u>, 540 U.S. at 24-25. If he cannot, then the fifth step requires assessment of whether, given claimant's RFC, he can make an adjustment to other work. 20 C.F.R. § 416.920(a)(4)(v). If he cannot, he will be found disabled. 20 C.F.R. § 416.920(a)(4)(v).

RFC is defined in the applicable regulations as "the most [the claimant] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1). To determine RFC, the ALJ "identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b),(c), and (d) of 20 [C.F.R. §§] 404.1545 and 416.945." <u>Cichocki v. Astrue</u>, 729 F.3d 172, 176 (2d Cir. 2013) (<u>per</u> <u>curiam</u>), <u>quoting</u> Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *1 (July

2, 1996).  The results of this assessment determine the claim-

ant's ability to perform the exertional demands[20] of sustained

work which may be categorized as sedentary, light, medium, heavy

or very heavy.  20 C.F.R. § 416.967; see Schaal v. Apfel, 134

F.3d 496, 501 n.6 (2d Cir. 1998).  This ability may then be found

to be limited further by nonexertional factors that restrict

claimant's ability to work.[21]  See Michaels v. Colvin, 621 F.

App'x 35, 38 n.4 (2d Cir. 2015) (summary order); Zabala v.

Astrue, 595 F.3d 402, 410 (2d Cir. 2010).

     The claimant bears the initial burden of proving

disability with respect to the first four steps.  Once the

claimant has satisfied this burden, the burden shifts to the

Commissioner to prove the final step -- that the claimant's RFC

allows the claimant to perform some work other than his past

work.  Selian v. Astrue, supra, 708 F.3d at 418; Burgess v.

Astrue, supra, 537 F.3d at 128; Butts v. Barnhart, 388 F.3d 377,

---

[20]Exertional limitations are those which "affect [plain-
tiff's] ability to meet the strength demands of jobs (sitting,
standing, walking, lifting, carrying, pushing, and pulling)."  20
C.F.R. § 416.969a(b).

[21]Nonexertional limitations are those which "affect only
[plaintiff's] ability to meet the demands of jobs other than the
strength demands," including difficulty functioning because of
nervousness, anxiety or depression, maintaining attention or
concentration, understanding or remembering detailed instruc-
tions, seeing or hearing, tolerating dust or fumes, or manipula-
tive or postural functions, such as reaching, handling, stooping,
climbing, crawling or crouching.  20 C.F.R. § 416.969a(c).

383 (2d Cir. 2004), amended in part on other grounds on reh'g,
416 F.3d 101 (2d Cir. 2005).

In some cases, the Commissioner can rely exclusively on
the medical-vocational guidelines (the "Grids") contained in
C.F.R. Part 404, Subpart P, Appendix 2 when making the determina-
tion at the fifth step.  Gray v. Chater, 903 F. Supp. 293, 297-98
(N.D.N.Y. 1995).  "The Grid[s] take[] into account the claimant's
RFC in conjunction with the claimant's age, education and work
experience.  Based on these factors, the Grid[s] indicate[]
whether the claimant can engage in any other substantial gainful
work which exists in the national economy."  Gray v. Chater,
supra, 903 F. Supp. at 298; see Butts v. Barnhart, supra, 388
F.3d at 383.

Exclusive reliance on the Grids is not appropriate
where nonexertional limitations "significantly diminish [a
claimant's] ability to work."  Bapp v. Bowen, 802 F.2d 601, 603
(2d Cir. 1986); accord Butts v. Barnhart, supra, 388 F.3d at 383.
"Significantly diminish" means "the additional loss of work
capacity beyond a negligible one or, in other words, one that so
narrows a claimant's possible range of work as to deprive him of
a meaningful employment opportunity."  Bapp v. Bowen, supra, 802
F.2d at 606; accord Selian v. Astrue, supra, 708 F.3d at 421;
Zabala v. Astrue, supra, 595 F.3d at 411.  When the ALJ finds

that the nonexertional limitations significantly diminish a
claimant's ability to work, then the Commissioner must introduce
the testimony of a vocational expert or other similar evidence in
order to prove "that jobs exist in the economy which the claimant
can obtain and perform." Butts v. Barnhart, supra, 388 F.3d at
383-84 (internal quotation marks and citation omitted); see also
Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983) ("If an indi-
vidual's capabilities are not described accurately by a rule, the
regulations make clear that the individual's particular limita-
tions must be considered.").  An ALJ may rely on a vocational
expert's testimony presented in response to a hypothetical if
there is "substantial record evidence to support the
assumption[s] upon which the vocational expert based his opin-
ion." Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983);
accord Snyder v. Colvin, 667 F. App'x 319, 321 (2d Cir. 2016)
(summary order) ("When the hypothetical posed to the vocational
expert is based on a residual functional capacity finding that is
supported by substantial evidence, the hypothetical is proper and
the ALJ is entitled to rely on the vocational expert's testi-
mony."); Rivera v. Colvin, 11 Civ. 7469, 2014 WL 3732317 at *40
(S.D.N.Y. July 28, 2014) (Swain, D.J.) ("Provided that the
characteristics described in the hypothetical question accurately
reflect the limitations and capabilities of the claimant and are

based on substantial evidence in the record, the ALJ may then rely on the vocational expert's testimony regarding jobs that could be performed by a person with those characteristics.").

### 3. Full and Fair Hearing and Duty to Develop the Record

#### a. Full and Fair Hearing

Before a district court evaluates an ALJ's analysis, a threshold question is whether "the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the [Social Security] Act." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (alterations in original; citation and internal quotation marks omitted); accord Thibodeau v. Comm'r of Soc. Sec., 339 F. App'x 62, 63 (2d Cir. 2009) (summary order).

In Moran v. Astrue, supra, the Court of Appeals elaborated on the ALJ's duty when the plaintiff is pro se and mentally impaired, stating that,

> [w]hen a claimant properly waives his right to counsel and proceeds pro se, the ALJ's duties are "heightened." Cruz, 912 F.2d at 11. The ALJ must "adequately protect a pro se claimant's rights by ensuring that all of the relevant facts are sufficiently developed and considered" and by "scrupulously and conscientiously prob[ing] into, inquir[ing] of, and explor[ing] for all the relevant facts." Id. (alteration and internal quotation marks omitted); accord Lamay, 562 F.3d at 508-09. And when a claimant appears pro se and is

> otherwise impaired, we must "make a searching investi-
> gation of the record to make certain that the claim-
> ant's rights have been adequately protected." <u>Cruz</u>, 912
> F.2d at 11 (internal quotation marks omitted).

569 F.3d at 112 (footnote omitted). Remand is warranted if the

ALJ failed to elicit relevant testimony from the claimant or his

representative. <u>See</u> <u>Robinson v. Sec'y of Health & Human Servs.</u>,

733 F. 2d 255, 258 (2d Cir. 1984) (ALJ failed to provide plain-

tiff with a fair hearing where the "record [was] replete with

instances where the claimant referred to missing documents and

the ALJ failed to follow up the claimant's inquiries");

<u>Encarnacion ex rel. George v. Barnhart</u>, 00 Civ. 6597 (LTS)(THK),

2003 WL 1344903 at *2 (S.D.N.Y. Mar. 19, 2003) (Swain, D.J.)

(remanding where ALJ failed to elicit testimony "about the nature

of [the claimant's] psychiatric treatment [or] her ADHD or

hyperactive behavior" despite testimony concerning the claimant's

inability to concentrate); <u>Straw v. Apfel</u>, 98 Civ. 5089 (RPP),

2001 WL 406184 at *3 (S.D.N.Y. Apr. 20, 2001) (Patterson,

D.J.)(remanding where ALJ "failed to ask any substantive fol-

low-up questions . . . about [the claimant's] conditions. For

example, [despite testimony that the claimant] received 'counsel-

ing once a week,' the ALJ failed to inquire as to the reason why

and what treatment he received.")

"Whether a claimant received a full and fair hearing

depends on various factors, such as 'whether the ALJ asked

questions regarding the disposition and extent of the claimant's subjective symptoms, the number of witnesses, and the length of the transcript.'" Estrella v. Berryhill, 15 Civ. 6966 (CS)(LMS), 2017 WL 2693722 at *22 (S.D.N.Y. June 22, 2017) (Seibel, D.J.) (citation omitted). The length of the hearing has frequently been found important in determining whether the claimant was afforded a full and fair hearing. See Moran v. Astrue, supra, 569 F.3d at 112-13 (court reviewed 13-page transcript and determined that the ALJ failed to give pro se claimant sufficient assistance in developing the record); Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990) ("scant record . . . consist[ing] of a thirteen-page transcript" was insufficient where ALJ failed to ask pro se claimant follow-up questions about his conditions or request hospital records); Hankerson v. Harris, 636 F.2d 893, 895 (2d Cir. 1980) ("The [16-page hearing] record is replete with instances where the ALJ should have questioned plaintiff more fully concerning various aspects of his testimony."); Gallo v. Colvin, No. 15 Civ. 9302 (AT)(BCM), 2016 WL 7744444 at *10 (S.D.N.Y. Dec. 23, 2016) (Moses, M.J.) (Report & Recommendation) (collecting cases), adopted at 15 Civ. 9302 (AT)(BCM), 2017 WL 1215219 (S.D.N.Y. Mar. 31, 2017) (Torres, D.J.).

b.  <u>Duty to Develop the Record</u>

In addition to conducting the hearing in a fair and
thorough manner, the ALJ has an affirmative duty to develop the
record.  "It is the rule in [the Second] [C]ircuit that 'the ALJ,
unlike a judge in a trial, must [him]self affirmatively develop
the record' in light of 'the essentially non-adversarial nature
of a benefits proceeding.'"  <u>Pratts v. Chater</u>, 94 F.3d 34, 37 (2d
Cir. 1996), <u>quoting</u> <u>Echevarria v. Sec'y of Health & Human Servs.</u>,
685 F.2d 751, 755 (2d Cir. 1982); <u>see</u> 20 C.F.R. § 416.912(d)
(2015).[22]  "This duty exists even when the claimant is repre-
sented by counsel or . . . by a paralegal."  <u>Perez v. Chater</u>, 77
F.3d 41, 47 (2d Cir. 1996); <u>accord</u> <u>Petrie v. Astrue</u>, 412 F. App'x
401, 406 (2d Cir. 2011) (summary order) ("[W]here there are
deficiencies in the record, an ALJ is under an affirmative
obligation to develop a claimant's medical history even when the
claimant is represented by counsel." (alteration in original;
internal quotation marks omitted)); <u>Halloran v. Barnhart</u>, 362
F.3d 28, 31 (2d Cir. 2004) (<u>per</u> <u>curiam</u>) ("We have stated many
times that the ALJ generally has an affirmative obligation to
develop the administrative record . . . ." (internal quotation

---

[22]On March 27, 2017, the ALJ's duty to develop the record
was recodified from Section 416.912(d) to Section 416.912(b)
without any substantive changes.

41

marks omitted)); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000)
("The ALJ has an obligation to develop the record in light of the
non-adversarial nature of the benefits proceedings, regardless of
whether the claimant is represented by counsel."); Tejada v.
Apfel, supra, 167 F.3d at 774 (same). "When the ALJ fails to
develop the record fully, [the ALJ] does not fulfill [the duty to
provide a full hearing] and the claimant is deprived of a fair
hearing." Lopez v. Sec'y of Health & Human Servs., 728 F.2d 148,
150 (2d Cir. 1984); see Corporan v. Comm'r of Soc. Sec., 12 Civ.
6704 (JPO), 2015 WL 321832 at *22 (S.D.N.Y. Jan. 23, 2015)
(Oetken, D.J.).

The ALJ is required "affirmatively to seek out addi-
tional evidence only where there are 'obvious gaps' in the
administrative record." Eusepi v. Colvin, 595 F. App'x 7, 9 (2d
Cir. 2014) (summary order), quoting Rosa v. Callahan, 168 F.3d
72, 79 & n.5 (2d Cir. 1999); accord Swiantek v. Comm'r of Soc.
Sec., 588 F. App'x 82, 84 (2d Cir. 2015) (summary order).[23]

_____

[23]On March 26, 2012, the regulations were modified to delete
the requirement that an ALJ must recontact a treating physician
when "the report from [a claimant's] medical source contain[ed] a
conflict or ambiguity that must be resolved, the report does not
contain all the necessary information, or does not appear to be
based on medically acceptable clinical and laboratory diagnostic
techniques." 20 C.F.R. § 416.912(e)(1) (2011); see How We
Collect & Consider Evidence of Disability, 77 Fed. Reg. 10,651,
10,651 (Feb. 23, 2012) (codified at 20 C.F.R. pts. 404, 416).
The amended regulations apply here. See Lowry v. Astrue, 474 F.
(continued...)

"[T]he current amended regulations . . . give an ALJ more discre-

tion to 'determine the best way to resolve the inconsistency or

insufficiency' based on the facts of the case . . . ." <u>Rolon v.

Comm'r of Soc. Sec.</u>, 994 F. Supp. 2d 496, 505 (S.D.N.Y. 2014)

(Nathan, D.J.), <u>quoting</u> 20 C.F.R. §§ 404.1520b(c)(1),

416.920b(c)(1) (2013).  However, the regulations continue to

"contemplate the ALJ recontacting treating physicians when 'the

additional information needed is directly related to that

source's medical opinion.'" <u>Jimenez v. Astrue</u>, 12 Civ. 3477

(GWG), 2013 WL 4400533 at *11 (S.D.N.Y. Aug. 14, 2013)

(Gorenstein, M.J.), <u>quoting</u> <u>How We Collect and Consider Evidence

of Disability</u>, <u>supra</u>, 77 Fed. Reg. at 10,651-01, 10,652.

> "[I]f a physician's finding in a report is believed to
> be insufficiently explained, lacking in support, or
> inconsistent with the physician's other reports, the
> ALJ must seek clarification and additional information
> from the physician." <u>Calzada v. Asture</u>, 753 F. Supp.
> 2d 250, 269 (S.D.N.Y. 2010); <u>see</u> <u>also</u> <u>Rosa</u>, 168 F.3d at
> 79 (citing <u>Perez v. Chater</u>, 77 F.3d 41, 47 (2d Cir.
> 1996)).  The rationale behind this rule is that "a
> treating physician's 'failure to include this type of
> support for the findings in his report does not mean
> that such support does not exist; he might not have
> provided this information in the report because he did
> not know that the ALJ would consider it critical to the
> disposition of the case.'" <u>Rosa</u>, 168 F.3d at 80 (quot-
> ing <u>Clark v. Comm'r of Soc. Sec.</u>, 143 F.3d 115, 118 (2d
> Cir. 1998)).

---

[23](...continued)
App'x 801, 804 n.2 (2d Cir. 2012) (summary order) (applying the
version of the regulations that were current at the time the ALJ
adjudicated the plaintiff's claim).

<u>Geronimo v. Colvin</u>, 13 Civ. 8263 (ALC), 2015 WL 736150 at *5

(S.D.N.Y. Feb. 20, 2015) (A. Carter, D.J.).

Under certain circumstances, a court may consider new

evidence in determining whether an ALJ discharged her duty to

develop the record.

> The district court "may at any time order additional
> evidence to be taken before the Commissioner of Social
> Security, but only upon a showing that there is new
> evidence which is material and that there is good cause
> for the failure to incorporate such evidence into the
> record in a prior proceeding." 42 U.S.C. § 405(g).
> New evidence is considered material if (1) it is "rele-
> vant to the claimant's condition during the time period
> for which benefits were denied," (2) it is "probative,"
> and (3) there is "a reasonable possibility that the new
> evidence would have influenced the [Commissioner] to
> decide claimant's application differently." <u>Pollard</u>,
> 377 F.3d at 193 (quoting <u>Tirado v. Bowen</u>, 842 F.2d 595,
> 597 (2d Cir. 1988)). In <u>Pollard</u>, this Court held that
> medical evidence generated after an ALJ's decision
> could not be deemed irrelevant solely because of tim-
> ing, explaining that subsequent evidence of the sever-
> ity of a condition suggests that the condition may have
> been more severe in the past than previously thought.
> 377 F.3d at 193.

<u>Williams v. Comm'r of Soc. Sec.</u>, 236 F. App'x 641, 644 (2d Cir.

2007) (summary order).

"Failure to sufficiently develop the administrative

record results in the denial to [the] claimant of a full and fair

hearing and is thus grounds for remand." <u>Price ex rel. A.N. v.

Astrue</u>, 42 F. Supp. 3d 423, 432 (E.D.N.Y. 2014); <u>see also</u> <u>Lopez

v. Sec'y of Health & Human Servs.</u>, <u>supra</u>, 728 F.2d at 150;

<u>Corporan v. Comm'r of Soc. Sec.</u>, <u>supra</u>, 2015 WL 321832 at *2,

44

citing <u>Selmo v. Barnhart</u>, 01 Civ. 7374 (SHS), 2002 WL 31445020 at *7 (S.D.N.Y. Oct. 31, 2002) (Stein, D.J.).

B.  The ALJ's
    Decision

The ALJ applied the five-step analysis described above and determined that plaintiff was not disabled (Tr. 9-19).

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity after his application date (Tr. 11).

At step two, the ALJ found that plaintiff suffered from the following severe impairments:  residual right ankle pain status post open reduction/internal fixation of a fracture, pes planus deformity, scoliosis, obesity, Asperger's and anxiety (Tr. 11).  The ALJ noted that these medically determinable impairments significantly compromise plaintiff's overall ability to meet the basic physical and mental demands of work (Tr. 11).  The ALJ found that plaintiff's sinus problems and tuberculosis were not severe impairments (Tr. 11-12).

At step three, the ALJ found that plaintiff's disabilities did not meet the criteria of the listed impairments and that he was not, therefore, entitled to a presumption of disability (Tr. 12-14).  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In coming to this conclusion, the ALJ concluded that plaintiff's complaints of

right ankle and back pain were not corroborated by the medical evidence (Tr. 12). The ALJ stated that there was no medical evidence confirming that plaintiff was treated for these conditions after Dr. Baird diagnosed them in June 2012 (Tr. 12, 15). The ALJ also stated that Dr. Baird "provided no clinical findings or imaging evidence to support the diagnoses proposed" and that the consultative examiner's orthopedic examination from October 2012 was "quite unremarkable from a muskuloskeletal standpoint" (Tr. 12). The ALJ also noted that a November 2013 consultative examination was "essentially normal" (Tr. 12).

With respect to plaintiff's mental impairments, the ALJ found that plaintiff had mild restrictions in his activities of daily living, moderate difficulties in social functioning and concentration, persistence or pace and no episodes of decompensation of extended duration (Tr. 13). In coming to this conclusion, the ALJ found that plaintiff's diagnoses of anxiety disorder and depressive disorder were based on plaintiff's "subjective complaints and reports of his mental functioning" and that in the "absence of evidence documenting any psychiatric treatment since February 2013," plaintiff had failed to satisfy the criteria for a listing based on a mental impairment (Tr. 13). The ALJ found that plaintiff's assertion that he was diagnosed with Asperger's in high school was "uncorroborated" and his

"self-report of significant social difficulties throughout childhood and young adulthood" was inconsistent with the record (Tr. 13).  The ALJ concluded instead that "it could be argued" that plaintiff's social difficulties could be attributed to the fact that he was a "bisexual genderqueer male" who felt misunderstood by his family (Tr. 13).

The ALJ then determined that plaintiff retained the RFC to perform sedentary work except that he was

> limited to sitting 2 hours continuously, at which time he would need to change position to standing in the work area, and [was also limited] to standing 2 hours continuously, but [that plaintiff] can alternate between standing and sitting in 2 hours [sic] intervals throughout an 8-hour day.  Mentally, the claimant can perform simple tasks, learn new tasks, maintain attention and concentration sufficiently to perform simple tasks, and maintain a schedule, but is unable to work with the public or in tandem with co-workers.

(Tr. 14).

The ALJ also considered plaintiff's testimony and found that plaintiff's statements "concerning the intensity, persistence and limiting effects of his alleged symptoms to be somewhat exaggerated and lacking in credibility, as they clearly are not entirely consistent with, or supported by, the overall thrust of the medical and nonmedical evidence of record" (Tr. 16).  In reaching this conclusion, the ALJ relied on the fact that plaintiff had not been receiving ongoing treatment for his physical conditions since June of 2012 or for his mental impairments since

47

February 2013 (Tr. 15-16).  The ALJ noted that she would not
consider plaintiff's homelessness in determining whether he was
disabled (Tr. 15).

The ALJ did not state how much weight she was giving to
the opinions of plaintiff's treating or consultative examiners,
with one exception.  The ALJ afforded "little weight" to consul-
tative examiner Dr. Belford's opinion that plaintiff could not
maintain attention and concentration (Tr. 17).  The ALJ noted
that "no treating source has declared the claimant to be disabled
or incapable of working or has even assessed any specific limita-
tions in his ability to function on a day-to-day basis" (Tr. 16,
citing Ex. 1F-4F, 11F and 12F).  The ALJ recognized that plain-
tiff's therapist assigned him a GAF score of 50 in February 2013,
which indicated a serious impairment, but concluded that the GAF
rating did not provide a valid basis for finding functional
limitations beyond the proposed RFC finding (Tr. 16-17).  The ALJ
also found that plaintiff's therapist was not an acceptable
medical source and that her findings were inconsistent with the
opinions of the consultative psychiatric examiners (Tr. 17).

At step four, the ALJ concluded that plaintiff could
not do his past work as an academic tutor, clerical associate or
laborer (Tr. 17).

At step five, the ALJ found that given plaintiff's age, education, work experience and RFC there were jobs that existed in significant numbers in the national economy that plaintiff could perform (Tr. 17-18). The ALJ noted that the VE opined that such an individual could do the work of a document preparer, addresser, surveillance system monitor and ticket counter (Tr. 18). The ALJ concluded that the VE's testimony was consistent with information in the DOT, that plaintiff could perform those occupations, and, accordingly, that plaintiff was not disabled (Tr. 18-19).

C. Analysis of the
ALJ's Decision

Plaintiff argues that remand is warranted because the ALJ failed to provide a full and fair hearing and failed to develop the record. Plaintiff also argues that he did not voluntarily waive his right to representation, that the ALJ did not properly weigh the opinion evidence and that the ALJ's vocational assessment was not supported by substantial evidence (Mem. of Law in Supp. of Plaintiff's Motion for Judgment on the Pleadings, dated Jan. 17, 2017 (D.I. 21); Plaintiff's Reply Mem. in Further Supp. of his Motion for Judgment on the Pleadings and in Opposition to Defendant's Motion for Judgment on the Plead-ings, dated Jan. 27, 2017 (D.I. 23)). The Commissioner disputes

49

plaintiff's contentions and asserts that the ALJ's decision was supported by substantial evidence and should be affirmed (Mem. of Law in Supp. of the Commissioner's Motion for Judgment on the Pleadings, dated Jan. 3, 2017 (D.I. 18); Defendant's Reply Mem. in Further Supp. of Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Cross Motion for Judgment on the Pleadings, dated Jan. 24, 2017 (D.I. 22)).

### 1. Full and Fair Hearing and Duty to Develop the Record

#### a. Full and Fair Hearing

Although plaintiff suffered from physical and mental impairments and appeared at the hearing without representation, the ALJ failed to discharge her obligation to follow up on several issues that affected the ALJ's disability determination.[24]

As an initial matter, the ALJ did not fully inform plaintiff of the purpose of the hearing and how statements he made there could affect the ALJ's decision. Plaintiff informed the ALJ at the outset of the hearing that he had not received written notification of the hearing and that he did not know why

---

[24]The length of the hearing alone, which lasted 27 minutes and yielded a 17-page transcript, is sufficient to raise concern that the ALJ failed to conduct an adequate inquiry (Tr. 26-42).

he needed a hearing (Tr. 27-28). Among other things, the written notice would have advised plaintiff of the issues to be decided, his right to representation and information about how the time and place of the hearing may be changed. See 20 C.F.R. § 416.1438; see Tr. 58-72. It does not appear that plaintiff received all of this information through other means. When plaintiff asked the ALJ why he needed a hearing, the ALJ ignored plaintiff's question and proceeded to seek plaintiff's waiver of his right to representation (Tr. 27-29). Thus, there is a serious question as to whether plaintiff fully understood the purpose of the hearing and how his statements, or silence on certain issues, would affect the outcome of the ALJ's disability determination.

The ALJ also failed to develop the testimonial record as to plaintiff's mental impairments, which were plaintiff's primary bases for seeking disability benefits. For example, the ALJ did not ask plaintiff whether he had recently sought mental health treatment. Nonetheless, in finding that plaintiff's mental impairments were not severe enough to be disabling, the ALJ wrote that plaintiff had not received "any psychiatric treatment whatsoever since February 2013" (Tr. 17). However, there was evidence in the record that was submitted to the ALJ before the hearing that contradicted this conclusion; plaintiff

told Dr. Woods in November 2013 that he saw a therapist once a week (Tr. 397). Nonetheless, the ALJ did not ask plaintiff at the hearing whether he sought mental health treatment after February 2013 nor did she follow up with plaintiff about his statement to Dr. Woods that he was seeing a therapist on a weekly basis as of November 2013.

Further, despite evidence in the record as well as testimony from plaintiff that his mental impairments and social issues made it difficult for him to find work, the ALJ failed to question plaintiff fully about his social, educational and vocational background at the hearing. When evaluating the severity of a mental impairment, one of the factors to be consid-ered is the degree to which the impairment impacts a claimant's social functioning. See 20 C.F.R. § 416.920a (2011).[25] Further, a "claimant's educational background, age, and work experience" are relevant to the disability determination. Brown v. Apfel, supra, 174 F.3d at 62 (citation omitted).

The ALJ relied on evidence in the record indicating that plaintiff did not have a good relationship with his family to discount the significance of plaintiff's mental impairments

---

[25]The text of 20 C.F.R. § 416.920a was amended as of January 17, 2017 and March 27, 2017. The regulations that were in effect at the time of the Commissioner's decision apply here. Accord Paredes v. Comm'r of Soc. Sec., 16 Civ. 810 (BCM), 2017 WL 2210865 at *11 n.13 (S.D.N.Y. May 19, 2017) (Moses, M.J.).

without asking plaintiff about this issue.  In February 2013,
plaintiff's therapist reported that plaintiff had issues with his
family because of his sexual orientation (Tr. 389).  In evaluat-
ing plaintiff's mental impairments, the ALJ concluded that it was
more likely that plaintiff's social difficulties were due to his
identification as a "'bisexual genderqueer male' who reportedly
has often felt misunderstood by his family," rather than his
Asperger's diagnosis (Tr. 13).  Before reaching this broad
conclusion, the ALJ should have sought to develop the record by
asking plaintiff about his family life and sexual orientation at
the hearing and what relationship it had to his alleged mental
impairments and his social functioning.

        As another example, the ALJ failed to ask plaintiff how
his Asperger's affected his ability to pursue an education.
Plaintiff testified that he was first diagnosed with autism in
high school, (Tr. 38), and, as noted above, plaintiff was placed
in an Individualized Education Program to account for his
Asperger's (Tr. 389).  The record also shows that, despite his
mental impairments, plaintiff pursued a college degree and a
master's degree in seminary (Tr. 128, 272, 389, 411).  The ALJ
did not ask plaintiff about his educational background and how he

managed his mental impairments before his alleged onset date.[26]
Further, at the hearing, plaintiff testified that his mental
state had worsened since he had been expelled from seminary
school and that he did not understand the significance of his
diagnosed mental impairments (Tr. 38-39; see also Tr. 334).[27]
The ALJ did not follow up with plaintiff concerning his testimony
to determine whether plaintiff's expulsion contributed to or was
related to the possible progression of his mental or social
impairments.[28]  This information could have affected the ALJ's
conclusion that plaintiff's mental impairments did not prevent
him from working.

---

[26]In his disability application, plaintiff alleged that his
disability commenced in May 2012, approximately one year after he
was expelled from seminary school (Tr. 111, 117, 389).

[27]In response to the ALJ's questioning as to whether
plaintiff had any mental illness or "problems" that she should be
aware of, plaintiff noted that he had been diagnosed with autism
and stated that, "[s]ince I fell out of seminary I have -- I
guess they might -- I don't know.  I've had some frustration, I
guess I call it[,] about what's been going on in my life since"
(Tr. 38).

[28]New evidence submitted to the Appeals Council sheds some
light on plaintiff's testimony that things worsened after he was
expelled from seminary.  Senior social worker Avitabile noted
that plaintiff told him that plaintiff had had a "severe
altercation with an unreasonable faculty professor" over an
assignment that led to his being expelled from seminary school
(Tr. 435-36).  It is not clear whether plaintiff's social and
mental impairments contributed to this altercation and its
consequences.  As discussed further below, the ALJ should further
develop the record on plaintiff's mental health treatment during
the relevant period.

Further, the ALJ failed to ask plaintiff follow up questions regarding the impact of his mental impairments on his inability to find work. Plaintiff testified that he sought job placement assistance at WeCARE, but had been unsuccessful (Tr. 33). The ALJ did not ask plaintiff any questions about his experience with WeCARE or seek records from WeCARE.[29] Instead, in response to plaintiff's statement about his experience at WeCARE, the ALJ asked plaintiff whether he believed that his medical conditions or his homelessness prevented him from working (Tr. 33). Plaintiff responded that he was not sure (Tr. 33). Without following up with plaintiff on his efforts to find work, the ALJ concluded that plaintiff testified that his homelessness "contributed to his inability to find employment" and that she would not consider this in the disability determination (Tr. 15). Given plaintiff's documented mental health history, including a reported inability to relate well to others and delusions of grandiosity (Tr. 39-40, 389-90, 411), it is not surprising that plaintiff was unable to answer the ALJ's questions about what prevented him from working with certainty. See Thibodeau v. Comm'r of Soc. Sec., supra, 339 F. App'x at 64 (questioning by the ALJ that was "strikingly terse and negatively phrased" and

---

[29]The September 2014 FEGS report, which was submitted after the ALJ's decision was issued, corroborates that WeCARE had prepared a report for plaintiff on February 15, 2013 (Tr. 459).

which elicited "brief responses rather than elaboration" from the claimant did not "meet an ALJ's 'heightened' duty to protect a pro se claimant's rights by 'scrupulously and conscientiously probing into, inquiring of, and exploring for all the relevant facts.'" (citation omitted); Moran v. Astrue, supra, 569 F.3d at 114 ("In light of the meager record and [the claimant's] manifest[ly] debilitating [anxiety disorder], it was especially important for the ALJ to help [the claimant] develop a testimonial record of the critical events -- even if those events were in the distant past").  Thus, the ALJ's failure to develop the record with respect to plaintiff's social, educational and work history was erroneous.

The ALJ also erred when she relied on plaintiff's apparent lack of medical treatment to discount his credibility without ascertaining why plaintiff did not seek out treatment (Tr. 15-17).  For example, the ALJ found that the fact that plaintiff had not been "under the active care of any doctor or outpatient clinic for pain or any other physical symptom since June 2012" detracted from his credibility (Tr. 16).  However, the ALJ did not ask plaintiff at the hearing why he had not sought medical care.  The ALJ noted that plaintiff testified that his ankle pain was "controlled by over-the-counter aspirin with no reported side effects" (Tr. 16).  This is not a completely

accurate summary of plaintiff's testimony.  Plaintiff testified
that he took aspirin for pain when he could afford it and that he
had not seen a "health person" since he left the youth system
(Tr. 37).  The record indicates that plaintiff's homelessness and
indigency may have been one of the reasons, if not the principal
reasons, that he did not seek treatment (Tr. 37, 300, 311, 315-
16, 402).  The ALJ should have asked plaintiff about the impact
of his poverty on his ability to seek medical care before relying
on the lack of treatment to discount his credibility.  See Garcia
v. Colvin, 741 F.3d 758, 761 (7th Cir. 2013) ("an administrative
law judge is not allowed to infer from an applicant's failure to
have sought medical care that he's a malingerer without asking
him why he didn't seek care -- and specifically whether he had
health insurance") (emphasis in original); see also Orn v.
Astrue, 495 F.3d 625, 638 (9th Cir. 2007) (an inability to afford
medical treatment does not support an adverse credibility deter-
mination); Sickler v. Colvin, 14 Civ. 1411 (JCF), 2015 WL 1600320
at *15 (S.D.N.Y. Apr. 9, 2015) (Francis, M.J.)(finding that the
ALJ erroneously failed to consider the plaintiff's finances which
would have explained why his care was "sporadic and conservative"
and why he was unable to obtain more consistent medical treat-

ment); SSR 16-3P, 2016 WL 1119029 at *8-*9 (Mar. 16, 2016)[30]

("When we consider the individual's treatment history, we may consider [that] . . . [a]n individual may not be able to afford treatment and may not have access to free or low-cost medical services.").  The ALJ should have also considered whether plaintiff's Asperger's diagnosis impaired his understanding of the need for treatment, given that there was evidence that plaintiff lacked insight, had notions of grandiosity and had GAF scores indicating serious impairments (Tr. 389-91, 411-12).  Thus, the ALJ erred in relying on the absence of medical records to find that plaintiff's medical conditions were unsupported without giving plaintiff the opportunity to explain why he did not seek medical treatment.

The errors described above denied plaintiff a full and fair hearing, and, as discussed below, these errors were compounded by the ALJ's failure to develop the medical record.

b.  <u>Duty to Develop the Record</u>

The ALJ also failed to develop the medical record regarding plaintiff's mental health treatment.  For example, the ALJ concluded that LMSW Moeller's diagnosis that plaintiff

---

[30]SSR 16-3p supersedes SSR 96-7p, 1996 WL 374186 (July 2, 1996), and clarifies the policies set forth in the previous SSR. <u>See</u> SSR 16-3P, <u>supra</u>, 2016 WL 1237954.

suffered from Asperger's was "uncorroborated" (Tr. 13, <u>citing</u> Tr. 390), without seeking clarification from plaintiff, LMSW Moeller or plaintiff's doctors as to the basis for the diagnosis. The record shows that Dr. Ahmed, a psychiatrist, evaluated plaintiff in September 2012 and also diagnosed plaintiff with Asperger's and assigned him a GAF score of 50 (Tr. 410-12). The ALJ did not discuss Dr. Ahmed's opinion at all.[31] Further, plaintiff pro- vided the name and contact information for Dr. Daniel Vogel, a doctor at the Edgewater Systems for Balanced Living in Indiana, who treated plaintiff for Asperger's in 2005 and 2006 (Tr. 129). Plaintiff also provided SSA with the name and address of Dr. Nicole Taylor, a doctor at the University of Indianapolis, who diagnosed him with Asperger's based on a psychological assessment

---

[31]Both Dr. Ahmed and LMSW Moeller evaluated plaintiff while he was a resident of the Ali Forney Center (Tr. 389-91, 411-12). In failing to address Dr. Ahmed's opinion, the ALJ erroneously failed to evaluate the psychiatrist's opinion according to the regulations applicable to a treating physician. <u>See</u> 20 C.F.R. § 416.927(c). Further, the ALJ rejected LMSW Moeller's diagnosis without assigning any specific weight to her opinion. In assess- ing the opinion of an "other source," such as LMSW Moeller, the ALJ should still have applied the factors listed in 20 C.F.R. § 416.927(c). <u>See</u> SSR 06-03p, 2006 WL 2329939 at *4-*5 (Aug. 9, 2006) ("Although the factors in 20 CFR 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from 'acceptable medical sources,' these same factors can be applied to opinion evidence from 'other sources.'"); <u>see also</u> <u>Williams v. Colvin</u>, 15 Civ. 4173 (ALC), 2016 WL 3034494 at *9 (S.D.N.Y. May 26, 2016) (Carter, D.J.); <u>Rivera v. Colvin</u>, 13 Civ. 7150 (PGG)(HBP), 2015 WL 1027163 at *15 (S.D.N.Y. Mar. 9, 2015) (Gardephe, D.J.); <u>Losquadro v. Astrue</u>, 11 Civ. 1798 (JFB), 2012 WL 4342069 at *15 (E.D.N.Y. Sept. 21, 2012).

performed in 2009 (Tr. 128).  The ALJ did not seek medical

records from these doctors before concluding that plaintiff's

Asperger's diagnosis was "uncorroborated."[32]

As another example of the ALJ's failure to develop the

record, the ALJ concluded that plaintiff's anxiety and depression

were not severe in part because "it [was] not even documented

that the claimant has been under the active care of any doctor or

outpatient clinic for pain or any other physical symptom since

June 2012 or under the care of a psychiatrist, therapist, or any

other mental health professional for symptoms of anxiety or

depression since February 2013" (Tr. 16).  However, as noted

above, plaintiff told Dr. Woods that he was seeing a therapist on

a weekly basis as of November 2013 (Tr. 397).  The ALJ should

have determined who the treating provider was and sought records

from him or her.[33]  To the extent that plaintiff's claim that his

_____

[32]Plaintiff has submitted new evidence with this motion from
NP McCabe where she indicates that she may have obtained copies
of the reports from plaintiff's doctors in Indiana that supported
the Asperger's diagnosis (see Exhibit annexed to Pl. Notice of
Motion, dated Jan. 17, 2017 (D.I. 19)).  The ALJ should consider
this new evidence on remand.

[33]Further, in evidence submitted after the ALJ's decision,
social worker Avitabile at New Alternatives noted that plaintiff
had been a client of New Alternatives since 2008, where he had
been receiving individual and group therapy, clinical casework
and supportive housing advocacy (Tr. 434-35).  Similarly, plain-
tiff told FEGS in September 2014 that he was receiving mental
health treatment at a clinic in the Bronx where he met with a
(continued...)

mental limitations significantly limited his ability to work was
unsubstantiated "by virtue of lacunae in the record, it was
incumbent upon the ALJ to see to it that these gaps were filled
by supplemental evidence." See Taylor v. Barnhart, 117 F. App'x
139, 141 (2d Cir. 2004) (summary order).

The ALJ also failed to develop the record on plain-
tiff's physical impairments. For example, the ALJ incorrectly
rejected Dr. Baird's diagnoses of plaintiff's orthopedic condi-
tions on the ground that he "provided no clinical findings or
imaging evidence to support the diagnoses proposed" (Tr. 12). To
the contrary, Dr. Baird sent plaintiff for an x-ray of his spine
on June 21, 2012 and provided his diagnoses following that
examination; both the x-ray report and the treatment notes were
in the record before the ALJ (Tr. 262, 273, 277-78). The radiol-
ogist who interpreted the X-rays found that plaintiff had moder-
ate to severe scoliosis in two regions of his spine (Tr. 262).
The ALJ thus erred in his assessment of Dr. Baird's treatment
notes by overlooking this evidence and by failing to seek clari-
fication of Dr. Baird's medical opinion. See Cruz v. Sullivan,
supra, 912 F.2d at 12 ("We have repeatedly stated that when the

---

[33](...continued)
psychiatrist once a week (Tr. 458, 467-68). On remand, the ALJ
should seek these records and consider evidence that plaintiff
was taking advantage of the low-cost clinics available to him for
treatment of his most severe condition.

ALJ rejects the findings of a treating physician because they were conclusory or not supported by specific clinical findings, he should direct a <u>pro se</u> claimant to obtain a more detailed statement from the treating physician."); <u>Armstrong v. Colvin</u>, 12 Civ. 8126 (VB), 2013 WL 6246491 at *18 (S.D.N.Y. Dec. 3, 2013) (Bricetti, D.J.) (finding that ALJ failed to provide plaintiff with a full and fair hearing in part because the ALJ failed to procure a report from plaintiff's treating physician that set forth his opinion as to the "existence, the nature and the severity" of plaintiff's claimed disabilities); <u>Cabrera v. Astrue</u>, 06 Civ. 9918 (JCF), 2007 WL 2706276 at *8 (S.D.N.Y. Sept. 18, 2007) (Francis, M.J.) ("[T]he ALJ must also 'make every reasonable effort to obtain . . . a report that sets forth the opinion of that treating physician as to the existence, the nature and the severity of the claimed disability.'" (citing cases), <u>modified on reconsideration on other grounds</u>, 2008 WL 144697 (S.D.N.Y. Jan. 16, 2008)).  On remand, the ALJ should review the clinical evidence that she overlooked, and where necessary, seek additional evidence from Dr. Baird.

### c.  <u>Summary</u>

Given plaintiff's <u>pro se</u> status, mental impairments and professed confusion as to the purpose of the hearing, the ALJ's

perfunctory questioning and failure to follow up on issues that were relevant to the disability determination were erroneous and denied plaintiff a full and fair hearing. The ALJ's deficient questioning was exacerbated by the fact that she failed to develop the medical evidence and seek relevant documentary evidence before concluding that plaintiff's disability claims were unsupported by the record.

> ### 2. Plaintiff's Additional
> ### Arguments for Remand

Plaintiff also claims that remand is appropriate because he did not knowingly waive his right to representation, the ALJ did not properly weigh the opinion evidence and the VE's testimony was not supported by substantial evidence. In light of my finding that plaintiff did not receive a full and fair hearing, it is not necessary to consider those arguments. Plaintiff is now represented by counsel and may submit any new arguments and evidence to the SSA for consideration on remand. See Hankerson v. Harris, 636 F.2d 893, 897 (2d Cir. 1980) ("Now that plaintiff has been provided by this court with competent counsel, who we assume will continue to represent him, it is likely that many of the important ambiguities discussed above can be cleared up through additional proceedings before the Secretary.").

3.  <u>Remedy</u>

The ALJ's failure to provide plaintiff with a full and
fair hearing and to develop the medical evidence warrant remand-
ing the case to the Commissioner.  <u>See</u> <u>Pratts v. Chater</u>, <u>supra</u>,
94 F.3d at 39 ("When there are gaps in the administrative record
or the ALJ has applied an improper legal standard, we have, on
numerous occasions, remanded to the [Commissioner] for further
development of the evidence." (internal quotation marks and
citation omitted)); <u>see</u> <u>also</u> <u>Schaal v. Apfel</u>, 134 F.3d 496, 504
(2d Cir. 1998) ("[O]n this record, we cannot say with certainty .
. . whether further clarification of the record with [the]
regulations in mind might alter the weighing of the evidence.").
On remand, the ALJ should provide plaintiff with the opportunity
for an additional hearing, attempt to obtain medical records from
all of plaintiff's treating sources, and, where appropriate,
obtain and weigh medical opinion evidence.

IV.  <u>Conclusion</u>

Accordingly, for all the foregoing reasons, plaintiff's
motion for judgment on the pleadings (D.I. 19) is granted to the

extent that this matter is remanded for further proceedings
pursuant to sentence four of 42 U.S.C. § 405(g) and the Commis-
sioner's motion for judgment on the pleadings (D.I. 17) is
denied.

Dated:    New York, New York
          September 18, 2017

                              SO ORDERED,

                              HENRY PITMAN
                              United States Magistrate Judge

Copies transmitted to:

Melissa A. Zeidler, Esq.
Nassau Suffolk Law Services
5th Floor
1 Helen Keller Way
Hempstead, New York  11550

Emilia Sicilia, Esq.
Urban Justice Center
16th Floor
123 William Street
New York, New York  10038

Sixtina Fernandez, Esq.
Social Security Administration
Office of The General Counsel
Suite 3904
26 Federal Plaza
New York, New York  10278